Daniel Lamey, Respondent, v David Foley et al., Appellants, and Kawasaki Motors Corp. USA, Respondent. (Appeal No. 1.)

Fourth Department, February 5, 1993

### APPEARANCES OF COUNSEL

*O'Shea, Reynolds, Napier, Cummings & Kirby,* Buffalo *(Kenneth Kirby* and *Kevin J. Bauer* of counsel), for appellants.

*Faraci, Guadagnino, Lange & Johns,* Rochester *(Paul K. Lange* and *Carol A. McKenna* of counsel), for Daniel Lamey, respondent.

*Saperston & Day, P. C.,* Buffalo *(Lawrence A. Schulz, Neil A. Goldberg* and *James S. Nowak* of counsel), for Kawasaki Motors Corp. USA, respondent.

*Lester Schwab Katz & Dwyer,* New York City *(Eric A. Portuguese* of counsel), for Product Liability Advisory Council and another, *amici curiae.*

### OPINION OF THE COURT

DENMAN, P. J.

On October 9, 1983, plaintiff Daniel Lamey was rendered a paraplegic as a result of an all-terrain vehicle (ATV) accident that occurred while he was performing a promotional stunt at the request of a television crew. The accident occurred at a race track at which a competition was later to take place among plaintiff and other professional ATV riders. As a result of his injuries, plaintiff commenced this action against, *inter alia,* Kawasaki Motors Corp. USA, the designer, manufacturer and/or marketer of the ATV, and David Foley, Beth Roll, and ATV Octoberfest, who promoted the event and designed the track.

Before us are two appeals. Defendants Foley, Roll and ATV Octoberfest appeal from an order that denied their motion for summary judgment. Defendant Kawasaki appeals from a separate order that denied its motion for summary judgment. The grounds for the motion and the contentions on appeal are similar in each case. Defendants assert that, as a matter of law, plaintiff assumed the risk of his injuries, thus negating any duty on the part of defendants, and that plaintiff's conduct constituted an intervening, superseding cause of his injury. Additionally, defendant Kawasaki asserts that, as a matter of law, postsale modifications to the ATV bar recovery for plaintiff's injuries.

The records on appeal show that plaintiff, who was 22 years old at the time of the accident, had been riding ATVs for about seven years and had been racing on the rather loosely organized professional circuit for about a year. Unofficially, he was ranked as one of the top two or three professional riders in the country. There is no question that plaintiff generally understood the hazards of riding three-wheel ATVs and the particular risks that arise in connection with racing them in close confines at high speeds in proximity to other, sometimes inexperienced, racers. Plaintiff was particularly aware of the risk of losing control of his vehicle, with its inherently unstable three-wheel design, and of being thrown off the ATV into an obstacle. In fact, during a videotaped interview conducted only minutes before the accident, plaintiff expressly acknowledged the risk of crashing.

Plaintiff teamed up with Rob Selvy, an experienced ATV rider, in 1982. With plaintiff's assistance, Selvy, a skilled mechanic, modified ATVs extensively to make them "race ready". One such vehicle was the Kawasaki three-wheel Model KXT-250 "Tecate", supplied by the race promoter, that plaintiff was riding at the time of the accident. According to the record, the stock model, with a maximum speed of approximately 50 miles per hour, is not suited for racing. Accordingly, using "aftermarket" parts that they had brought with them to New York, Lamey and Selvy modified the ATV's cylinders, cylinder heads, carburetor, exhaust system, shock absorber system, frame, rear axle, wheels, tires and gearing. Those modifications significantly altered the power, speed and acceleration of the ATV, and also improved its durability, but there is no evidence that they adversely affected the general handling and stability of the vehicle. As alleged by plaintiff, that vehicle is inherently unstable because of its three-wheel

design and lack of a rear differential. Because of the lack of a differential, both rear wheels must turn at the same speed. As a result, the vehicle has an inherent resistance to being turned—the vehicle "wants" to travel in a straight line—and that characteristic is more pronounced at high speeds. When the vehicle is turned at high speeds, centrifugal force tends to make it tip. To counteract that force, the driver must lean to the inside of the turn and, more importantly, must break the traction of the rear wheels so that the vehicle slides through the turn. Generally, the driver breaks the traction by manipulating the clutch and the accelerator to cause the wheels to spin. On a dirt or gravel track, such as the one where the accident occurred, that is most easily accomplished when the vehicle is being driven in the "groove", i.e., the well-traveled, hard-packed part of the track surface. On the remainder of the track, the "cushion" or loose part not packed down by vehicles, turning is more difficult and dangerous because the rear wheels of the ATV catch the loose dirt and gain traction.

The accident occurred on October 9, 1983 at the ATV Octoberfest at the Cattaraugus County Fairgrounds, an event organized by defendants Foley and Roll. Roll personally invited plaintiff to participate. The course was set up by Foley after consulting Ron Crandel, an experienced track designer. The course was on a horse race track, which was surrounded by a wooden fence. Before setting up the course, Foley asked Crandel about placing hay bales along the fence, but Crandel said he could not give advice without seeing the course. On the morning of the accident, hay bales were placed flat on the track in front of the fence, not vertically against the fence.

Plaintiff had arrived at the track on October 5th, four days before the accident, and had raced on it in the preliminary rounds held on October 8th. It is not clear whether plaintiff specifically took notice of the location of the hay bales and fence when he arrived at the track on the morning of the 9th, but the conditions were open and obvious. Plaintiff engaged in a promotional interview and simulated race in which he had been asked to participate by a television crew. The simulated race took place after plaintiff had given the interview and had taken a warm-up lap on the track and performed several stunt jumps at the request of the television crew. For the simulated race, a camera was set up amidst the hay bales in front of the fence, in the "high speed corner" adjacent to the straightaway. The first run was completed by plaintiff and several other riders without incident. They were then asked to

repeat the same ride, but this time plaintiff was asked to ride "high" in the corner and throw dirt at the camera. Selvy testified that the "high slide" that plaintiff was asked to do was "very dangerous" because it required him to turn at high speed in proximity to the fence, in "no man's land", the loose area of the track where it was likely to be difficult to turn the vehicle without tipping. Nevertheless, plaintiff agreed to accommodate the television crew.

The racers left the starting line and approached the corner, with plaintiff swinging his vehicle to the outside of the corner, passing directly in front of the camera. It is disputed whether plaintiff was traveling at approximately 50 miles per hour, as he recalled, or as fast as 65 miles per hour, as Selvy testified. Whatever the case, as plaintiff passed the camera, he felt his rear wheels begin to gain traction in the soft dirt of the "cushion" on the outside of the track. As he sensed he would lose control of the vehicle and flip over, plaintiff popped the clutch and hit the accelerator to break the traction of the wheels and continue his slide. He succeeded in regaining control of his vehicle momentarily but, as he did so, his speed took him too "high" into the corner. His right rear wheel hit one of the hay bales, causing the ATV to flip. Plaintiff was thrown over the bales and into an unprotected fence post. The impact severed plaintiff's spinal cord.

Plaintiff instituted this action against Kawasaki and the event organizers and promoters, defendants Foley, Roll and ATV Octoberfest. As against Kawasaki, the amended complaint states causes of action for strict products liability and negligence, based primarily upon claims of design defect and failure to warn. As against the promoters, plaintiff alleged negligence in failing to place the hay bales properly or otherwise protect him from the risk of hitting the fence.

Following joinder of issue and discovery, both sets of defendants moved for summary judgment dismissing the complaint. The court denied both motions, giving rise to these appeals.

### APPEAL OF FOLEY, ROLL AND ATV OCTOBERFEST.

## There are questions of fact concerning whether plaintiff assumed the risk of his injury.

■ Defendants contend that, as a matter of law, plaintiff assumed the risk of his injury, thus barring his recovery. Care

must be taken to distinguish between two distinct doctrines of assumption of risk. The first is embraced within the CPLR article 14-A concept of "culpable conduct attributable to the claimant" (CPLR 1411). It is akin to comparative negligence; it does not bar recovery, but diminishes recovery in the proportion to which it contributed to the injuries (CPLR 1411). We are here concerned with another category of assumption of risk, sometimes called "primary" assumption of risk *(see, Turcotte v Fell,* 68 NY2d 432, 438). If applicable, the doctrine of primary assumption of risk is not a measure of plaintiff's comparative fault, but a measure of the defendant's duty of care. Primary assumption of risk eliminates or reduces the tortfeasor's duty of care to the plaintiff and, in the former case, constitutes a complete bar to recovery, notwithstanding CPLR article 14-A *(see, Turcotte v Fell, supra,* at 438-439; *Maddox v City of New York,* 66 NY2d 270, 276; *Arbegast v Board of Educ.,* 65 NY2d 161, 165-171). Primary assumption of risk may be express or implied *(compare, Arbegast v Board of Educ., supra,* at 162, *with Maddox v City of New York, supra,* at 276). The doctrine is frequently applied, or sought to be applied, to claims of injury arising out of a plaintiff's participation in a sporting or entertainment event or activity, whether amateur or professional *(see, Owen v R.J.S. Safety Equip.,* 79 NY2d 967, *affg* 169 AD2d 150 [professional auto race]; *Benitez v New York City Bd. of Educ.,* 73 NY2d 650 [high school football game]; *Turcotte v Fell, supra* [professional horse race]; *Maddox v City of New York, supra* [major league baseball game]; *Arbegast v Board of Educ., supra* ["donkey basketball" game]; *Adamczak v Leisure Rinks Southtown,* 170 AD2d 951 [broomball game]; *Marlowe v Rush-Henrietta Cent. School Dist.,* 167 AD2d 820, *affd* 78 NY2d 1096 [gym class baseball game]; *Verro v New York Racing Assn.,* 142 AD2d 396, *lv denied* 74 NY2d 611 [professional horse race]; *Cole v New York Racing Assn.,* 24 AD2d 993, *affd* 17 NY2d 761 [same]; *see also, Sutfin v Scheuer,* 74 NY2d 697, *affg* 145 AD2d 946 [game of catch]).

The applicability of the doctrine depends on the nature and scope of the participant's awareness and consent *(see, Turcotte v Fell, supra,* at 439). "As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation" *(Turcotte v Fell, supra,* at 439, citing *Maddox v City of New York, supra,* at 277-278; *see, Benitez v New York City Bd. of Educ., supra,*

at 657). On the other hand, the defendant generally has a duty to exercise reasonable care to protect athletic participants from "unassumed, concealed or unreasonably increased risks" *(Benitez v New York City Bd. of Educ., supra,* at 658). To establish plaintiff's assumption of risk, a defendant must show that plaintiff was aware of the defective or dangerous condition and the resultant risk, although it is not necessary to demonstrate that plaintiff foresaw the exact manner in which his injury occurred *(Maddox v City of New York, supra,* at 278). Whether it can be concluded that a plaintiff made an informed estimate of the risks involved in an activity before deciding to participate depends on the openness and obviousness of the risk, plaintiff's background, skill, and experience, plaintiff's own conduct under the circumstances, and the nature of defendant's conduct[1] *(see, Benitez v New York City Bd. of Educ., supra,* at 657-659; *Turcotte v Fell, supra,* at 440, 442; *Maddox v City of New York, supra,* at 277-278). Perhaps the most important factor, however, is whether the risk is inherent in the activity *(Owen v R.J.S. Safety Equip., supra,* at 970; *Turcotte v Fell, supra,* at 443-444; *Maddox v City of New York, supra,* at 277).

A plaintiff will not be held to have assumed those risks that are not inherent *(see, Cole v New York Racing Assn., supra,* at 994; *see also, Owen v R.J.S. Safety Equip., supra),* i.e., not " ' "ordinary and necessary" ' " in the sport *(Turcotte v Fell, supra,* at 443, quoting *Cole v New York Racing Assn., supra,* at 994). The conditions that exist at similar facilities are relevant to that inquiry, as are the rules of the game *(Turcotte v Fell, supra,* at 440-443). Generally, the issue of assumption of risk is a question of fact for the jury *(Maddox v City of New York, supra,* at 279; *see, Owen v R.J.S. Safety Equip., supra);* however, if the facts are not in dispute, it may be decided as a matter of law *(see, Maddox v City of New York, supra).*

Here, defendants Foley, Roll and ATV Octoberfest sustained their initial burden on the motion for summary judgment. They adduced a great deal of evidence to show that the fence surrounding the track was an open and obvious hazard and that plaintiff willingly participated in the stunt race with a general appreciation of the risk of his being injured as a result of his being thrown from the ATV. Nevertheless, in

---

1. As a general rule, a plaintiff will be held not to have assumed the risk of injury intentionally or recklessly caused by a defendant *(Turcotte v Fell, supra,* at 439).

opposition to the motion, plaintiff succeeded in raising a triable question of fact. Plaintiff submitted the EBT testimony of an expert in setting up ATV race tracks, the same expert consulted by Foley before the event. He testified that the hazard created by defendants, the unpadded fence post on the outside of a high-speed turn, was not ordinary or necessary in the sport, but was contrary to the way tracks ordinarily are designed. Additionally, he testified, and plaintiff otherwise showed, that unpadded obstacles violate the rules of the American Motorcyclist Association, the governing body of the sport. Plaintiff adduced medical proof that the unpadded fence unreasonably increased the risk of injury and in fact caused his injuries. Further, it is inferable that the placement of the hay bales on the surface of the track, where they could interfere with riders, constituted an unreasonably enhanced risk not inherent in the sport. Under the circumstances, we conclude that it is a triable question of fact whether plaintiff assumed the risk of his injuries *(see, Owen v R.J.S. Safety Equip., supra; Cole v New York Racing Assn., supra)*.

## The issue of causation is a question of fact.

■ Defendants contend that, as a matter of law, plaintiff's conduct constituted an unforeseeable, superseding cause of his injuries. Defendants refer to plaintiff's voluntary participation in the stunt race, and allege that he rode too fast, too "high" on the track, and too close to the fence. Whether an intervening act constitutes a superseding cause depends on whether the intervening act is "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct" *(Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315). "An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk that renders the actor negligent" *(Derdiarian v Felix Contr. Corp., supra,* at 316).

Plaintiff was injured when he was thrown into an unpadded fence post. That was the very risk created by defendants' alleged negligence. Therefore, it cannot be concluded as a matter of law that plaintiff's allegedly culpable conduct severed the causal connection between defendants' alleged negligence and plaintiff's injuries. The question of causation must be determined by the trier of fact.

APPEAL OF KAWASAKI.

## The doctrine of primary assumption of the risk is not a defense to a products liability claim.

■ Kawasaki contends that, as a matter of law, plaintiff assumed the risk of his injuries by voluntarily participating in the stunt with awareness of the risks, thus eliminating any duty on Kawasaki's part to refrain from placing an allegedly defective product into the stream of commerce. We conclude that the doctrine of primary assumption of the risk cannot constitute a defense to a claim of strict products liability.[2]

The doctrine of strict products liability imposes upon a manufacturer or seller the obligation to compensate a person injured as a consequence of a product "defect", including an improper design, a mistake in manufacturing, or a failure to warn *(Voss v Black & Decker Mfg. Co., supra,* at 106-107). A defective product is one which, at the time it leaves the defendant's hands, is in a condition not reasonably contemplated by the consumer and which is unreasonably dangerous for its intended use *(Robinson v Reed-Prentice Div.,* 49 NY2d 471, 479). Alternatively, a defective product is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce *(Robinson v Reed-Prentice Div., supra)*. The concept of strict products liability is one of the broadest liability doctrines known to the law. It allows recovery *without* proof of negligence, in the absence of a guarantee or privity of contract, and notwithstanding contractual disclaimers of liability. Thus, the general focus of the doctrine is not upon the conduct of the parties, but on the characteristics of the product *(cf., Voss v Black & Decker Mfg. Co., supra,* at 107).

It is generally recognized that there are four primary rationales underlying the development of the doctrine of strict products liability. First, the defendant " 'unquestionably in-

---

2. In contrast, CPLR article 14-A assumption of risk, a species of comparative fault, is a valid defense to any action to recover damages for personal injury, including a products liability action. As the Court of Appeals repeatedly has held, the manufacturer of a defective product is liable to any person injured thereby provided that, *inter alia,* the plaintiff could not by the exercise of reasonable care have discovered the defect and perceived its danger or otherwise averted his injury or damages *(Voss v Black & Decker Mfg. Co.,* 59 NY2d 102, 106, citing *Codling v Paglia,* 32 NY2d 330, 342; *Micallef v Miehle Co.,* 39 NY2d 376, 387-388).

tends and expects that the product will be purchased and used in reliance upon his express assurance of its quality * * * Having invited and solicited the use, the manufacturer should not be permitted to avoid responsibility * * * when the expected use leads to injury and loss' " *(Codling v Paglia, supra,* at 339, quoting *Randy Knitwear v American Cyanamid Co.,* 11 NY2d 5, 13). Second, "[i]n today's world, it is often only the manufacturer who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose. Once floated on the market, many articles in a very real practical sense defy detection of defect, except possibly in the hands of an expert after laborious and perhaps even destructive disassembly" *(Codling v Paglia, supra,* at 340). Third, the cost of injury can best be borne by those who make and sell defective products; they have the capacity to pass on their economic loss to those who purchase the products *(Codling v Paglia, supra,* at 341). Fourth, through the imposition of strict liability, pressure is brought on the manufacturer to produce safer and more socially useful goods *(Codling v Paglia, supra).* For the foregoing reasons, a "manufacturer is under a nondelegable duty to design and produce a product that is not defective" *(Robinson v Reed-Prentice Div., supra,* at 479) and, in accordance with the public's expectations, must "stand behind" its goods that prove to be defective and injurious *(Sage v Fairchild-Swearingen Corp.,* 70 NY2d 579, 585).

The doctrine of primary assumption of the risk, in contrast, is based on the plaintiff's consent, express or implied, to relieve the defendant of his duty of care in whole or in part *(Turcotte v Fell, supra,* at 438-439). Such consent is inferred from plaintiff's voluntary participation in the injurious activity with "knowledge of the injury-causing defect [and] appreciation of the resultant risk" *(Maddox v City of New York, supra,* at 278). Where primary assumption of risk is present, it does not merely diminish plaintiff's recovery, but eliminates or qualifies whatever duty defendant otherwise would owe to plaintiff in the circumstances *(see, Turcotte v Fell, supra,* at 438-439; *Arbegast v Board of Educ., supra,* at 170). Thus, a claim of strict products liability and a defense of primary assumption of risk are in inherent conflict, and one must give way.

We conclude that the defense of primary assumption of risk is not available to eliminate or reduce a manufacturer's duty to produce a nondefective product *(see generally,* 1 Weinber-

ger, New York Products Liability § 23:23), even where the product's dangerous qualities are obvious to and appreciated by the user *(see, Micallef v Miehle Co.,* 39 NY2d 376, 383-387, *supra).* To allow a defendant to escape its nondelegable duty to make a safe product by invoking the implied consent of the product user would undermine the policies underlying the doctrine of strict products liability. It would erode a defendant's incentive to achieve safety in design and production and would sanction the marketing of dangerous products.

<u>There are questions of fact concerning whether the</u>

<u>accident was the result of plaintiff's</u>

<u>alleged recklessness and his modifications</u>

<u>to the vehicle.</u>

In seeking summary judgment, defendant relies on the rule that "[m]aterial alterations at the hands of a third party which work a substantial change in the condition in which the product was sold * * * however foreseeable that modification may have been, are not within the ambit of a manufacturer's responsibility" *(Robinson v Reed-Prentice Div., supra,* at 481). Nevertheless, postsale modifications to a product do not defeat a products liability claim unless those modifications (a) rendered "a· safe product defective" *(Robinson v Reed-Prentice Div., supra,* at 479); and (b) caused the injuries *(Amatulli v Delhi Constr. Corp.,* 77 NY2d 525, 532).

The record contains expert evidence that the ATV, as a result of its extreme instability, was unreasonably dangerous for its intended use at the time it left defendant's hands. Additionally, it is inferable on this record that the extensive modifications made to the vehicle improved its speed, acceleration and durability, but did not further impair its stability. Thus, there is a triable question of fact whether the modifications rendered "a safe product defective" *(Robinson v Reed-Prentice Div., supra,* at 479) or merely made an already defective product more dangerous. If the latter, the modifications would not necessarily preclude liability. Moreover, on the issue of causation, there is conflicting evidence concerning how fast plaintiff's vehicle was traveling at the time of the accident. Plaintiff's testimony that he was traveling 50 miles per hour, i.e., at a speed within the capability of a "stock" ATV, raises a question of fact concerning whether the modifications were the cause of the accident.

Similarly, we conclude that there are triable questions of fact concerning whether, as alleged by defendant, plaintiff's reckless conduct constituted an unforeseeable misuse of the product and hence a superseding cause of his injuries, thus defeating his claim that the product was defective. In order to constitute a superseding cause, the intervening act must be extraordinary under the circumstances, not foreseeable, or independent of and far removed from defendant's alleged wrongful conduct *(Derdiarian v Felix Contr. Corp., supra,* at 315). It cannot be said as a matter of law that plaintiff's loss of control of his ATV and resultant injury were extraordinary, unforeseeable or attenuated from defendant's design of an allegedly unstable vehicle. Moreover, given the allegation and proof that plaintiff was injured while attempting to perform a maneuver within the advertised capabilities of the ATV, it cannot be said as a matter of law that plaintiff's alleged recklessness was the exclusive, superseding cause of his injuries.

Accordingly, the orders should be affirmed.

BOOMER, GREEN, BALIO and DAVIS, JJ., concur.

Order unanimously affirmed, without costs.