*986 OPINION OF THE COURT
John L. Bell, J.
On January 11, 1986, claimant sustained severe personal injuries when the two-man bobsled he was driving crashed during the National Bobsled Championship at the Olympic bobsled run on Mount Van Hoevenberg, Town of North Elba, Essex County. The crash occurred in the exit chute section of the run beyond the finish line. The gravamen of claimant’s negligence cause of action rests upon the purportedly dangerous condition of the exit chute. The trial was bifurcated and thus issues related to liability are currently before the court.
It merits noting at the outset that claimant was an experienced bobsledder. He started bobsledding at Mount Van Hoevenberg when he was 8 years old. He was 30 years old at the time of the accident. His father had competed in bobsledding and 9 of claimant’s 10 siblings had been involved in the sport of bobsledding. Indeed, one of claimant’s brothers died in a tragic bobsledding accident in 1981, vividly illustrating the extreme risk and danger inherent in a sport where competitors come down a mountain on ice at speeds approaching 100 miles per hour.
The bobsled run at Mount Van Hoevenberg was the only bobsled run in North America at the time of claimant’s accident.[2] Originally constructed for the 1932 Winter Olympic Games in Lake Placid, the bobsled run was completely reconstructed between 1978 and 1980 in preparation for the 1980 Winter Olympic Games. Although the distance, turns and run layout remained the same, the reconstruction project modernized the run by, among other things, using concrete for the track so that it could be refrigerated.
Another change made in the bobsled run, which is particularly critical to the instant claim, involved a redesign of the area in which bobsleds traveled after crossing the finish line. The area immediately following the finish is of obvious importance since bobsleds often reach their maximum speed at the finish.
[The portion of the opinion in which the court addressed a jurisdictional issue raised by defendant has been omitted for purposes of publication.]
The court now turns to the issue of liability. Claimant, who *987 had competed extensively at the run both before and after its reconstruction, testified about the changes in the track in the area beyond the finish line. Prior to reconstruction, a bobsled would cross the finish line, traverse a short flat area and then proceed up a hill. From the time it crossed the finish line until it reached the top of the hill, the bobsled would remain in a chute. Claimant stated that the chute was about 80 yards in length. The walls of the chute were composed of wood covered with ice and were continuous with no openings. The walls were approximately three to four feet high and the width of the chute was approximately four to five feet. Claimant testified that after leaving the exit chute the bobsled would then proceed into an open snow-covered area. Once a sled stopped, it was pulled back through the open area to the loading ramp, where it would be placed on a truck for transporting.
The exit chute was lengthened as part of the reconstruction of the bobsled run. The new exit chute took the sleds over a flat area following the finish, then up the first hill, onto a second flat area, and then up a second hill. The exit chute, which was longer than before reconstruction, was composed of concrete. After the first hill, in the second flat area, a 20-foot opening was created in the left concrete wall. The bobsleds were removed from the track from such opening, and testimony established that in a normal run the sleds would be stopped by the time they reached the opening.
During competition, the entire exit chute had snow in it to help slow the bobsleds after they crossed the finish line. Bales of hay were placed at the two ends of the opening in the left wall of the exit chute to afford protection in the event a sled came in contact with the concrete abutment. The condition and composition of the exit chute when it was not covered by ice and snow is depicted by claimant’s exhibits 5 through 9. Its appearance during competition is reflected by defendant’s exhibits C through I. Defendant’s exhibit J, a videotape with footage of, inter alla, bobsled competition during the 1980 Winter Olympic Games, also provides a brief glimpse of the exit chute and the opening in the concrete wall as it appeared during the Olympics.
On the date of the accident, claimant was the driver of a two-man bobsled competing in the National Championship. His brakeman was Pat Murphy. Claimant had competed in bobsledding since the early 1960s and had been licensed as a driver in 1978 by the Federatione Internationale de Bobsleigh et de Tobaganning (hereinafter F.I.B.T.) after completing a *988 one-week school in Germany. He had driven sleds on the reconstructed Mount Van Hoevenberg run numerous times both in practice and competition and was endeavoring to capture a spot oil the 1988 United States Winter Olympic bobsledding team.
Claimant recalled that the race commenced at about 9:30 a.m. on Saturday, January 11, 1986. The race involved two runs on Saturday and two runs on Sunday. He completed the first run on Saturday without incident. Approximately an hour after completion of the first run, he began his second run. Claimant stated that he went into turn number 2 "too late,”[3] catching the end of the turn, which caused the sled to tip over. The sled remained tipped over or on its right side through turns 3, 4, 5, 6 and 7. During the time the sled was tipped over the brakeman fell out. Claimant, however, remained in the sled and in turn 8 the sled flipped back into an upright position on all four runners. Claimant then grabbed the steering ropes and attempted to maneuver the sled through the rest of the course. According to claimant the sled remained out of control, banging against the chute walls, and the steering was not working correctly. Nevertheless, he managed to keep the sled upright through the remaining 8 turns, including turn 16 and across the finish line. He estimated the speed of the sled at 40 to 60 miles per hour when he crossed the finish line.
Claimant testified that after crossing the finish line the sled started to hug the left wall of the exit chute and would not steer to the right. At approximately the beginning of the first hill of the exit chute, claimant attempted to move back to the second seat in the bobsled so he could apply the brakes. However, he was not able to get completely into the brakeman’s seat and thus could pull the brake handles only about half way up. He recalled that the sled was moving back and forth striking both walls of the exit chute while he was attempting to apply the brakes. The sled proceeded up the first hill and into the second flat area. As the sled reached the opening in the left wall of the exit chute it moved to the left, partially into the opening, and then "hit the abutment” where the left wall continued at the end of the opening. Several bales of hay had been placed in front of the abutment. Claimant was knocked unconscious by the impact. The instant claim, premised upon negligence, ensued.
*989 Precedent directly addressing liability in bobsledding is scant. Looking to other jurisdictions for guidance is not a viable option since the only bobsled run on the North American continent at the time of the accident was on Mount Van Hoevenberg (see generally, Annotation, Liability of Operator of Skiing, Tobogganing, or Bobsledding Facilities for Injury to Patron or Participant, 94 ALR2d 1431, § 11). The few reported cases from this jurisdiction addressing bobsled accidents offer little guidance germane to the issue before the court. Several of the cases involved injuries sustained by passengers who paid to ride on a bobsled operated by State employees (Kaiser v State of New York, 30 AD2d 482, appeal dismissed 23 NY2d 866; Ross v State of New York, 283 App Div 834; Cunningham v State of New York, 264 App Div 811). In the only reported case involving an accident by a participant in a competition at the bobsled run, the claim was premised upon a purported lack of proper medical personnel at the facility and the court noted that "claimant makes no claim for the original accident and injury” (Clark v State of New York, 195 Misc 581, 583, affd 276 App Div 10, affd 302 NY 795).
In the absence of pertinent precedent directly addressing accidents by bobsled competitors, the court turns to cases involving sports-related injuries. The basic principles were set forth by Judge Cardozo in Murphy v Steeplechase Amusement Co. (250 NY 479, 482-483), as follows:
"Volenti non fit injuria. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary * * * The timorous may stay at home.
"A different case would be here if the dangers inherent in the sport were obscure or unobserved * * * or so serious as to justify the belief that precautions of some kind must have been taken to avert them.”
More recently, the Court of Appeals has explained that the nature of the risk assumed is a measure of the defendant’s duty of care (Turcotte v Fell, 68 NY2d 432, 439). Thus, participants in a sporting competition, whether professional or amateur, generally are deemed to have consented to "those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation” (supra; see, Owen v R.J.S. Safety Equip., 79 NY2d 967; Benitez v New York City Bd. of Educ., 73 NY2d 650; Maddox v City of New York, 66 NY2d 270; Arbegast v Board of Educ., 65 NY2d 161). The owner of the premises is held to the duty of reasonable *990 care under the circumstances, an inherently factual determination that varies "depending upon the party seeking relief and his purpose in being on the premises” (Turcotte v Fell, supra, at 442).
Claimant’s purpose on January 11, 1986 was clear. He was an experienced bobsledder seeking to come down the mountain on a sheet of ice faster than any other competitor so that he could become a national champion and ultimately an Olympian. His experience had taught him that bobsledding was not a sport for the timorous or the wary. He had been in prior accidents, had witnessed accidents by other competitors and had experienced the tragedy of a sibling dying while competing in the sport.
The extreme risk inherent in the sport of bobsledding is apparent. Indeed, it is in part that risk that draws a rare breed of individuals to the sport. The commentator on the professional promotional video of the bobsled run introduced by defendant as exhibit J declares at the beginning of the presentation that the bobsled run at Mount Van Hoevenberg is "the fastest and most dangerous run in the world.” While the validity of such opinion is irrelevant, it is fitting to note it is the elements of speed and danger that ostensibly draw participants and spectators to the sport. It is unlikely that any bobsled run would be characterized by its promoters as the slowest and safest in the world.
The fact that the sport is driven by unusual speed and danger was perhaps best exemplified at trial by the testimony of Gary Sheffield. Mr. Sheffield’s extensive experience in bobsledding included, among many other accomplishments, the following: a gold medal in the 1959 World Championships in St. Moritz, Switzerland; a silver medal in the 1961 World Championships at Mount Van Hoevenberg; a member of the 1964 and 1968 United States Olympic Bobsled Teams; and the coach of the 1980 United States Olympic Bobsled Team. When asked by the court about the opening in the exit chute at Mount Van Hoevenberg, Mr. Sheffield candidly stated that "it could be improved.” He further explained that conditions exist at various facilities throughout the world that he does not like, but added, "that is the part of the sport that I really enjoy, running that fine edge” (emphasis supplied).
As was reflected by the testimony of Mr. Sheffield, the conditions at Mount Van Hoevenberg in January 1986 were not ideal. Consistent with such testimony was that of John F. *991 Coste, who was race director at the run on the date of the incident. Mr. Coste stated that the conditions are never 100%. However, if in the judgment of the director and race jury conditions were in the 80 to 90% range, the race occurred. Once started, every effort was made to move the race as quickly as possible since changing weather conditions would impact the runs of the racers.
The bobsled run received international approval and was used for the 1980 Winter Olympic Games. At the time of the accident, there were only a handful of bobsled runs in the entire world. One was in Lake Placid and the other three were in Europe. There was no evidence indicating that any of the runs had similar openings in the exit chute.
This case presents a difficult factual determination for the court, a determination upon which reasonable fact finders, albeit a jury or court sitting alone, may disagree. Bobsledding is a sport in which only a few unique individuals on the face of the globe choose to participate. No one with any experience in the sport could be so naive as to not realize the extreme risk presented by participation. Ordinarily, liability cannot fairly attach. Yet, at some point, those who control the track may create a danger so great that it would constitute negligence even in this sport where competitors seek to "run[ ] that fine edge.”
One of the arguments militating against a recovery by claimant is that the risk created by the 20-foot opening and exposed concrete abutment in the exit chute ostensibly was within the risk of acceptability in the bobsledding community. The entire bobsled run had been approved by the F.I.B.T. National championships, world championships and the 1980 Olympic Games were conducted on the bobsled run. Apart from the issue of the danger posed by the subject 20-foot opening and exposed concrete abutment, claimant knew the risks inherent in bobsledding generally and the specific risks at Mount Van Hoevenberg.
Turcotte v Fell (68 NY2d 432, supra) requires further consideration. The Court of Appeals observed that the statement whether there is or is not a duty in an assumption of risk case begs the essential question whether an injured party’s interests are entitled to legal protection against a defendant’s conduct. It further explained that a determination of the existence of a duty and the concomitant scope of that duty involves not only a consideration of the wrongfulness of a *992 defendant’s action or inaction but also an examination of the injured party’s reasonable expectations of the care owed to him by others. The Court then stated that "[t]his is particularly true in professional sporting contests, which by their nature involve an elevated degree of danger” (supra, at 437). The Court concluded that if the participant makes an informed estimate of the risk involved in the activity and willingly undertakes it, there can be no liability if he is injured as a result of those risks.
The same analysis must be applied to a bobsledder, and claimant concedes that certain inherent risks exist in the sport of bobsledding, including the risk of losing control of a sled, that can preclude the existence of a duty or the finding of liability. Essentially, claimant accepts the careful analysis of Judge Simons in Turcotte (supra) that certain risks are assumed in sporting events and that in the most basic sense the participant has given his consent in advance to relieve the defendant of an obligation toward him and to take his chances of injury from a known risk arising from what a defendant is to do or leave undone. However, claimant contends that the "primary” assumption of risk referred to in Turcotte has no application to his claim since it is predicated not upon the risks inherent in operating a two-man bobsled on the run at Mount Van Hoevenberg and injury-causing events which were known, apparent or reasonably foreseeable consequences of his participation in bobsledding, but instead upon the negligence of the State in creating and allowing the continued existence of a dangerous condition in the exit chute caused by the 20-foot opening in the left concrete wall and the concrete abutment at the end of the opening. The court agrees.
Another category of assumption of risk is "embraced within the CPLR article 14-A concept of 'culpable conduct attributable to the claimant’ * * * [and is] akin to comparative negligence; it does not bar recovery, but diminishes recovery in the proportion to which it contributed to the injuries (CPLR 1411)” (Lamey v Foley, 188 AD2d 157, 163). The application of such category to the present claim will be hereafter discussed.
The court concludes that apart from the lack of duty or nonliability of the owner of a bobsled run to a bobsledder for risks inherent in or the reasonably foreseeable consequences of participation in the sport of bobsledding, the owner nevertheless owes the duty of reasonable care in the construction and maintenance of the bobsled run as do owners of real property generally (see, Turcotte v Fell, supra, at 442; Akins v *993 Glens Falls City School Dist., 53 NY2d 325, 329; Basso v Miller, 40 NY2d 233, 237; Lamey v Foley, supra, at 164-165). Such duty was breached by defendant in reconstructing and maintaining on the bobsled outrun a 20-foot opening in the concrete wall at the end of which was an exposed concrete abutment. The opening and abutment did not constitute an assumed risk in the absence of proof of claimant’s awareness of the danger but instead constituted a lack of ordinary care on the part of the State. Such negligence was the proximate cause of the accident.
On October 10, 1978, Joseph A. McKillip, himself a former renowned American bobsledder, an international bobsledding judge, and the bobsled technical director for the 1980 Winter Olympic Games, in a letter to the site engineer of the New York State Department of Environmental Conservation, advised:
"As per our conversation of today, concerning the sled handling area at the outrun, in the area where the wall is open, it would be my suggestion to place a wing wall approximately 10 feet in length at the upper end of the opening. This wing wall would be set at an angle approximately 30 degrees to the Bobsled Run itself. It seems to me that this would climate [sic] a serious hazard to the bobsledders in the configuration as planned. The wall end presents a very dangerous situation.
"I experienced a very similar situation at Innsbruck, Austria where a sled came down, lost control and ended up astraddle the end of the wall, and the driver in this case spent over a year in the hospital with two broken legs.” (Claimant’s exhibit 11.)
Such advice presaged the unfortunate accident in which claimant was injured.
Although Mr. Sheffield disagreed with Mr. McKillip concerning placement of a wing wall since he felt a more dangerous condition would have been created, he acknowledged that no opening existed on the old run in the exit chute area and the obvious fact that if a gate had been in place where the 20-foot opening was present on the accident date, the bobsled driven by claimant would not have left the bobsled run. Significantly, James Lamy, who worked for ORDA as manager of the Mount Van Hoevenberg Recreation Area, also known as the Olympic Sports Complex, and himself a former bobsledder, acknowledged at an examination before trial that a partition or gate could have covered the 20-foot opening.
*994 Whenever the driver of a bobsled had it under control in the exit chute, the 20-foot opening in the exit chute would have posed little, if any, danger. Such opening facilitated the rapid removal of sleds at the time of bobsled competition, a need that one can readily perceive. But a well-known and common occurrence in the sport of bobsledding is that a bobsled may tip over during the run and one or more of the bobsled occupants may be ejected from the bobsled. Thus, prior to the subject accident it was reasonably foreseeable to those charged with the responsibility of reconstructing and maintaining the bobsled run that whenever a two-man bobsled tipped over and the driver remained the sole occupant, the bobsled, whether it remained tipped over or became upright, might continue across the finish line and into the exit chute out of control. Whenever a brakeman falls off during competition, a sled, without its brakes being applied in the exit chute, would be at increased risk. When deposed, Mr. Lamy agreed that a two-man bobsled tends to fishtail if the brakeman is ejected from the bobsled and that it becomes more difficult for the driver to control the sled.
In the present case, the court credits not only the testimony of claimant that the sled remained out of control after the brakeman was ejected from the bobsled when it tipped over but also his previously recited version concerning the movement of the bobsled down the bobsled run, including its return to an upright position, then through the exit chute until it moved to the left, partially into the 20-foot opening, and struck the exposed concrete abutment at the end of the opening.
Claimant testified that at one time prior to the accident date a gate or barrier had covered the 20-foot opening but that it had been removed prior to 1986. As previously noted, the proof also demonstrated that prior to reconstruction of the bobsled run around 1979, no opening existed in the outrun area and thus no danger of collision with a concrete abutment existed. Apparently no other world bobsled run had a similar opening in the exit chute area.
That a bobsled out of control might strike the subject exposed concrete abutment was reasonably foreseeable by the State during reconstruction. Significantly, the fact that several bales of hay customarily were placed in the 20-foot opening in front of the concrete abutment demonstrates that the inherent danger created by the concrete abutment was indeed perceived.
*995 The court rejects the State’s argument that the "preponderance of the evidence establishes that the competent producing cause of this accident was the culpable conduct of the claimant, both in turn two and in the area of the exit chute as well as the culpable conduct of the brakeman in that he failed to remain with the sled and was thereby unable to perform his appropriate function.” The argument demonstrates an apparent misapprehension of the nature of bobsledding. That a bobsled may tip over or overturn is an inherent risk in the sport of bobsledding, but such event does not constitute culpable conduct, whether it be denominated negligence or assumption of risk, under CPLR 1411, that interdicts recovery under the factual circumstances.[4]
But, assuming, arguendo, claimant’s culpable conduct in the operation of the bobsled as it plunged down the bobsled run, the existence of the 20-foot opening in the left concrete wall with an exposed abutment at the end of the opening constituted a foreseeable, superseding cause of the accident and did not constitute a risk inherent in the sport of bobsledding. A claimant (or plaintiff) will not be held to have assumed risks that are not inherent in the sport in which he or she engages (Lamey v Foley, 188 AD2d 157, 164, supra). Claimant’s assumption of those risks inherent in the sport of bobsledding did not encompass the inherent danger posed by the exposed concrete abutment at the end of the 20-foot opening in the left concrete wall of the exit chute. The present record is devoid of proof that "the danger was 'ordinary and necessary’ to the sport and thus inherent in the activity itself’ (Cole v New York Racing Assn., 24 AD2d 993, 994, affd 17 NY2d 761).
The Cole case (supra) is instructive. The deceased, a well-known jockey, was killed when, after being thrown from his mount, struck his head on certain footings that rose three to five inches above ground level and held certain metal posts angled away from a railing. As so elevated, the footings were nonexistent at any other racetrack in America. A verdict in favor of the deceased’s administratrix was upheld. In commenting upon the decision in Cole, the Court of Appeals, in Turcotte v Fell (supra) stated: "The decedent in Cole could not have consented to the danger created by the footings because *996 the danger of them did not 'inhere’ in the sport” (68 NY2d 432, 444 [emphasis supplied]). Nor did the exposed concrete abutment "inhere” in the sport of bobsledding. Like the footings in Cole, an opening in the wall of an exit chute, at the end of which was a concrete abutment, apparently did not exist at any other world bobsled run.
Reference to proof of prior accidents should be considered briefly. When Mr. Lamy was deposed before trial and asked whether he had ever observed or been informed of any other accident at the bobsled run since its reconstruction in 1979 in which a bobsled had struck the subject concrete abutment, he answered: "Yes, sir.” He was unable to tell claimant’s counsel the date of the accident or how many times such an accident had occurred. Although he indicated that a record was kept of every accident that occurred on the bobsled run, no other proof was offered at the trial by either party concerning other accidents.
Proof of prior accidents at the same place under substantially similar circumstances, or the absence of prior accidents, may be offered on the issues of foreseeability of danger and notice (see, e.g., Brady v Manhattan Ry. Co., 127 NY 46; Lafflin v Buffalo & Southwestern R. R. Co., 106 NY 136; Goldstein v C. W. Post Ctr., 122 AD2d 196; Hyde v County of Rensselaer, 73 AD2d 1021, affd 51 NY2d 927; PJI2d 2:12, 2:90). Here, sufficient proof was not elicited by claimant concerning prior accidents for the court to consider them on the issues of foreseeability and notice. Nor was proof offered by the State to demonstrate claimant’s knowledge of prior accidents of the same or similar nature at the same location. Indeed, had claimant been aware of prior accidents of the same or similar nature, the court would find that he had assumed the risk of injury as regards the 20-foot open area and exposed concrete abutment.
The burden of proof of claimant’s culpable conduct under CPLR 1411 rested upon the State, and it failed to demonstrate by a fair preponderance of the evidence claimant’s awareness of the dangerous condition or risk posed by the 20-foot opening and concrete abutment of the exit chute.
To the extent that the State contends that expert proof was required to sustain claimant’s burden of proof as to the State’s negligence, the court rejects such contention. Although experts are often called to offer testimony in liability claims involving negligence, the admissibility of opinion evidence as *997 to the cause of an accident is dependent upon whether the opinion offered aids the fact finder or will usurp the fact finder’s function. A jury, or, in the present case, the court can determine the cause of the subject accident from the facts presented in evidence without the guidance of an expert (see, Dougherty v Milliken, 163 NY 527; Putnick v H.M.C. Assocs., 137 AD2d 179; 58 NY Jur 2d, Evidence and Witnesses, § 673).
[The portion of the opinion addressing other defenses asserted by defendant has been omitted for purposes of publication. The court found the defenses unpersuasive and directed entry of an interlocutory judgment finding defendant liable to claimant.]
[Portions of opinion omitted for purposes of publication.]

. Another run was constructed for the 1988 Winter Olympic Games in Calgary, Canada.

. Unless otherwise indicated, quotes are from the court’s trial notes.

. The State’s argument that the brakeman was negligent in failing to remain with the bobsled when it tipped over and thus unable to perform his appropriate function and that such failure was a competent producing cause of the accident assumes that the brakeman had the option of remaining on the sled and, in any event, requires no further discussion.